Leticia Gutierrez FONSECA, Appellant,

v.

The STATE of Texas, Appellee.

Juan Manuel FONSECA, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 13–93–029–CR, 13–93–030–CR.

Court of Appeals of Texas, Corpus Christi.

July 14, 1994.

Charles Manning, Beeville, for appellant.

George P. Morrill, II, Dist. Atty., Beeville, for appellee.

Before KENNEDY, GILBERTO HINOJOSA and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

Leticia Gutierrez Fonseca, Juan Manuel Fonseca, and Delia Gomez were indicted for aggravated possession (between 200 and 2,000 pounds) of marihuana. Delia Gomez is not a party to this appeal.

On January 29, 1986, appellants, Leticia Gutierrez Fonseca and Juan Manuel Fonseca, pleaded not guilty to the indictment. On February 12, 1986, the trial court heard and denied appellants' motions to suppress and "Exceptions To The Indictments." On Feb-ruary 17, 1986, prior to trial commencing, appellants withdrew their not guilty pleas, entered pleas of guilty, and elected to have the jury assess punishment. Both cases were tried together and both appellants re-quested probation. Juan Manuel Fonseca was found guilty of aggravated possession of marihuana and punishment was assessed at confinement for 25 years and one day. Leti-cia Gutierrez Fonseca was also found guilty of aggravated possession of marihuana and punishment was assessed at confinement for 15 years and one day. Appellants failed to appear on the day of sentencing and eluded arrest for almost seven years. Appellants were finally sentenced in December 1992 in accordance with the jury verdict.

By three points of error, appellants con-tend that the trial court erred 1) by charging the jury in accordance with TEX.CODE CRIM. PROC.ANN. art. 37.07, § 4, 2) by failing to grant appellants' motions to suppress, and 3) by refusing to grant appellants' exceptions to the indictments. We affirm the trial court's judgments on guilt, reverse the trial court's judgments on punishment, and remand both cases for new trial on punishment only.

By their second point of error, appellants contend that the trial court erred by failing to grant appellants' motions to suppress. Appellants filed identical motions to sup-press, seeking to exclude the following mat-ters:

1. All tangible evidence seized on or about November 14, 1985 from a motor home, white and brown in color in the vicinity of US 281 and US 59 in Live Oak County, Texas;

2. All photographs taken by law enforce-ment officers of any matters seized from the Defendants or their vehicles;

3. All statements made and actions done by the Defendants, if any, at the time of and subsequent to their apprehension by law enforcement officers; and

4. Testimony of law enforcement officers, their agents, and all other persons work-ing in connection with such officers and agents as to the finding of matter al-leged to be marihuana.

Appellants alleged that these matters were seized as a result of an illegal detention,

arrest, and search in violation of their state and federal constitutional rights, as well as TEX.CODE CRIM.PROC.ANN. art. 38.23 (Vernon Supp.1994).

At the hearing on appellants' motions to suppress, the State called Officers Dennis Bryant, Robert Rhynsburger, and Gene Matocha to testify. Rhynsburger's testimony from the examining trial was admitted into evidence by stipulation of the parties. According to the officers, beginning in late September or early October 1985, the Drug Enforcement Administration (DEA) began surveillance of an organization in McAllen after it received information from a reliable informant that the organization had been air smuggling a large amount of marihuana into the Alice area. Bryant testified that he had received information from the informant since late 1980, that the informant was reliable, and that the informant had given him useful information many times in the past which resulted in numerous arrests and seizures. The informant had provided reliable information relating to large scale marihuana smuggling, heroin dealers, and "a lot of intelligence information."

Concerning this particular transaction, the informant told Bryant that a smuggling organization was transporting marihuana via aircraft and that over 1,000 pounds of marihuana were being transported each trip. The organization was based out of McAllen, had a pilot from Harlingen, and was using a landing strip in the Alice area (somewhere between Falfurrias and George West). After receiving this information, Bryant checked on the individuals allegedly involved in the organization and asked law enforcement agencies to perform telephone checks. Bryant subsequently received more specific information from the informant that on November 7, a McAllen man was to buy a motor home, register it in someone else's name, and use it to transport marihuana from this clandestine landing strip to probably Chicago, Illinois. The organization would use two families with children to transport the marihuana in this motor home. At the time, the informant did not know their names. Bryant was also told that the load of marihuana would be coming in by aircraft from Mexico "about the middle of the month" and put in the motor home for transport north.

Bryant conducted surveillance on the motor home from the time it was purchased on November 7, 1985, until it was subsequently stored at a house on Seminary Road, northwest of Edinburg. On November 13, 1985, the informant told Bryant that Guadalupe Garcia, a member of the organization, would be travelling to Mexico early the next morning to pick up a load. On November 14, 1985, at approximately 2:30 a.m., Bryant and Agent Louis Saldaña conducted surveillance on a McAllen house owned by Guadalupe Garcia. A small blue station wagon was parked at the house. At 5:30 a.m., Garcia was followed as he drove to a house in McAllen, where he stayed for about 15 to 20 minutes before leaving. The agents lost Garcia in traffic, but later relocated him at his house in McAllen. Saldaña continued surveillance of the motor home in Edinburg. At approximately 8:30 a.m., the motor home was driven to a car wash where it met a Cadillac. The motor home, carrying one man, two women and several children, then travelled north on U.S. Highway 281 to Alice, while the Cadillac and its single male driver drove south. Bryant and several agents followed the motor home to a convenience store in Alice, arriving at approximately 11:30 a.m. Once in Alice, the agents met with Agent McDonald and several deputies from Nueces County. The motor home stayed in the convenience store parking lot until sometime between 4:00 and 4:30 p.m., when Garcia's small blue station wagon pulled up to the parking lot. The station wagon then left and returned. For the next one and one-half hours the motor home travelled to several other convenience stores in Alice and met with the station wagon. At approximately 6:00 p.m., the vehicles switched passengers. The vehicles were then followed as they travelled north on U.S. Highway 281 out of Alice. A few miles south of the intersection of U.S. Highway 281 and Highway 624, the motor home turned off Highway 281 and travelled west on a dirt road. Concerned that ground units might be seen in such a remote area, the agents requested aircraft surveillance. Department of Public Safety (DPS) aircraft

continued surveillance and maintained radio contact with Bryant, who was on the ground.

As expected from the information provided by the informant, the motor home travelled to a remote ranch with an air landing strip, where it met with several other vehicles. According to Gene Matocha, a DPS pilot, the motor home first met with a stationary vehicle and exchanged light signals, apparently performing a check "to knock off any surveillance that might be following the vehicles." The motor home travelled on to a large ranch at the end of the road, after going through a gate. The ranch included a horse racetrack, an airstrip, and several large buildings. Two vapor lights were on. No other vehicles had their lights on. The motor home travelled to the back near the airstrip, turned off its lights, and remained there for about twenty or thirty minutes. Because it was dark, Matocha could not see what was happening on the ground. No airplane was seen on the strip.

Bryant next saw the motor home as it turned back onto U.S. Highway 281 and met with the station wagon and its occupants. Bryant then requested that DPS initiate a pretext stop of the motor home upon its arrival in George West, while there was still daylight. Bryant testified that the purpose of executing the pretext stop was to allow continued investigation into the air smuggling operations. Since then, law enforcement officers have seized additional loads of marihuana brought into the United States.

Bryant's request was relayed to DPS Officer Rhynsburger and Live Oak County Deputy Sheriff Vernon Bryan. Rhynsburger and Bryan were informed that a particular motor home would be travelling into George West and that it would be carrying approximately 1,000 pounds of marihuana. Rhynsburger and Bryan were instructed to follow and stop the motor home as it entered the city. After making visual contact with the motor home, Rhynsburger and Bryan fell in directly behind it. As the motor home passed a traffic light that had turned from yellow to red,

Rhynsburger decided to stop the vehicle. Rhynsburger activated his red lights and siren as he entered the intersection under a red light and kept them on until the motor home pulled over. Rhynsburger testified that he would have stopped any vehicle accelerating through a yellow light but admitted that there was nothing illegal about accelerating through a yellow light. Rhynsburger approached the left rear quarter of the motor home, asked the driver to step out of the vehicle, and requested his driver's license and proof of liability insurance. The driver identified himself as Juan Manuel Fonseca. Rhynsburger and Bryan stood on the passenger side of the vehicle while the driver searched for his liability insurance card. When a woman passenger rolled down her window, a crosswind caused the smell of burned marihuana to emanate from the vehicle. Rhynsburger asked Juan Manuel if there was anyone else in the vehicle, and Juan Manuel answered, "No." Rhynsburger had been told earlier that there were more people in the motor home. Rhynsburger then returned to his vehicle. As he performed a license check, Rhynsburger heard noises coming from the rear of the motor home and noticed movement inside. He then asked Juan Manuel for the second time if there were other people in the motor home. Juan Manuel responded that his sister-in-law was back there. Rhynsburger then asked Juan Manuel to open the motor home to check inside. A woman stood inside the open door, and several children lay on the floor. Rhynsburger leaned into the motor home and noticed a bundle of marihuana in plain view in the overhead compartment behind a slightly open hung curtain. Rhynsburger then called for backup. After they arrived, the officers entered the motor home and found numerous bundles of marihuana contained in trash bags.

■ Appellants contend that the officers lacked probable cause to make a warrantless stop and subsequent search of the motor home.[1] Appellants argue that, since there

---

1. Appellants contend that the prosecutor expressed doubt concerning the existence of probable cause because, at the hearing on appellants'

motion to suppress, the prosecutor made the following statement:

... Had these facts been presented to a justice of the peace as testified to here today, would

was no evidence to prove that any marihuana was flown in and unloaded at the ranch or loaded onto the motor home, that the motor home was seen leaving the ranch could raise no more than a "hunch" or mere suspicion that the vehicle contained marihuana. Appellants further contend that, even if probable cause existed to stop the motor home, they had plenty of time to obtain a search warrant from a magistrate for the vehicle, the ranch, or the individual appellants. Appellants contend that a warrantless arrest is not justified when the secrecy or "integrity" of an investigation might be violated if a warrant was first obtained. Appellants argue that there was no evidence that appellants were about to escape and that the officers could have seized the vehicle and obtained a search warrant first, citing *Chambers v. Maroney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970).

The State contends that when police saw the motor home leaving the ranch, probable cause arose. The State argued at the suppression hearing that the opportunity to obtain a warrant was hampered because of the mobility of the motor home and because the exact location of the ranch was unknown.

█ The standard for reviewing the existence of probable cause was established in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Whaley v. State*, 686 S.W.2d 950 (Tex.Crim.App.1985) (court renounced two prong test in *Aguilar v. Texas*). We apply the Supreme Court's "totality of the circumstances" approach to determine if there exists a substantial basis for concluding that probable cause existed at the time of the questioned action. An appellate court, when reviewing a ruling on a motion to suppress evidence, views the evidence in the light most favorable to the trial

court's ruling and defers to the trial court's findings. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Davis v. State*, 829 S.W.2d 218, 220 (Tex.Crim.App.1992). The trial judge is the sole trier of fact, and he or she may choose to believe or disbelieve any or all of the witnesses' testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). Absent a clear abuse of discretion, the ruling on the admissibility of evidence will not be disturbed. *Rivera v. State*, 808 S.W.2d 80, 96 (Tex.Crim.App.1991).

█ A warrantless search or seizure is *per se* unreasonable, subject to a few well-defined and limited exceptions. *United States v. Karo*, 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One recognized exception is the "automobile exception." *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 2068, 85 L.Ed.2d 406 (1985); *Martin v. State*, 780 S.W.2d 497, 499 (Tex.App.—Corpus Christi 1989, pet. ref'd). The State bears the burden of establishing the legality of a warrantless search or seizure. *Russell v. State*, 717 S.W.2d 7, 9 (Tex.Crim.App.1986); *Lalande v. State*, 676 S.W.2d 115, 116 (Tex. Crim.App.1984); *McVickers v. State*, 838 S.W.2d 651, 654 (Tex.App.—Corpus Christi 1992), aff'd, 874 S.W.2d 662 (Tex.Crim.App. 1993) (not yet reported).

Tex.Code Crim.Proc.Ann. art. 14.04 (Vernon 1987) states as follows:

Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about

there have been sufficient probable cause for the justice of the peace to issue a search warrant? The evidence or the answer I think clearly is yes, there would have been.
So the next question is why wasn't this done. And one of the reasons is *we didn't even know what county this transaction was going to take place, where the search warrant could be executed, nor who the drivers of the vehicle were in fact going to be.* They had the information there was going to be two families. *So there was the extensive circumstances not knowing*

*for a fact, we believe the deal was going to go down, but there was no real guarantee it was going to go down. Occasionally informants give bad information.* Based upon that information there was probable cause for an arrest. [Emphasis added].
We disagree with appellants' contention that the State, by the underscored statements, conceded that a warrant was not obtained because the information did not amount to probable cause.

to escape, so that there is no time to procure a warrant, such peace officer may, without a warrant, pursue and arrest the accused.

The question for this Court is whether the officers conducting surveillance of the motor home had reasonable suspicion to stop appellants, and upon doing so, whether probable cause developed to allow them to search the motor home and seize the contraband found inside.

An officer may temporarily stop and investigate a vehicle if the officer has reasonable suspicion based on articulable facts that the detainee is connected to unusual activity with some indication that the activity is related to crime. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Stone v. State,* 703 S.W.2d 652, 654 (Tex.Crim.App.1986); *Ramirez v. State,* 672 S.W.2d 480, 482 (Tex.Crim.App.1984). The test for "reasonable suspicion" requires consideration of the totality of the circumstances confronting the police. *Williams v. State,* 839 S.W.2d 469, 471 (Tex.App.—Corpus Christi 1992, pet. ref'd). When several officers are cooperating, their cumulative information is to be considered in determining whether reasonable suspicion exists at the time of the stop. *Hoag v. State,* 728 S.W.2d 375, 380 (Tex.Crim.App.1987). Where an investigating officer is in possession of sufficient knowledge to constitute probable cause, he need not detail such knowledge to the arresting officer. *See Tarpley v. State,* 565 S.W.2d 525, 530 (Tex.Crim.App. [Panel Op.] 1978) (arresting officer justified in arresting appellant upon information relayed by security officer in credit card abuse case).

Applying the law to the present circumstances, we hold that the warrantless stop and search executed by Officers Rhynsburger and Bryan was valid under the state and federal constitutions, as well as Tex.Code Crim.Proc.Ann. art. 14.04. The information given by the previously reliable informant, combined with appellants' subsequent actions which corroborated the information, gave law enforcement officers cause to stop appellants' vehicle.

Standing alone, appellants' conduct may appear to be as consistent with innocent as well as culpable conduct. However, the special information obtained by Officer Bryant from the reliable and credible informant was substantiated by the independent observations of the police. Officer Bryant observed appellants drive the designated vehicle from McAllen and arrive at the specified location. The automobile exception to the warrant requirement applies in this case, where the ready mobility of the vehicle is apparent and the vehicle is found in a setting that objectively indicates it is being used for transportation. *See Carney,* 471 U.S. at 390, 105 S.Ct. at 2068. The officers had abundant cause to stop and search the mobile home based on the information received from the reliable informant and the corroborating actions of the appellants. Further still, once stopped, Officers Rhynsburger and Bryan noticed the odor of marihuana, obtained the driver's consent to open the door to the motor home and were able to see the marihuana in plain view. An officer executing a valid stop and detecting the odor of marihuana coming from the defendant's vehicle is justified in his warrantless search of the vehicle. *Duff v. State,* 546 S.W.2d 283, 286 (Tex.Crim.App.1977).

Therefore, the trial court could have reasonably concluded that reasonable suspicion existed at the time of the stop to detain and search the motor home. Appellants' second point of error is overruled.

By their third point of error, appellants contend that the trial court erred by refusing to grant their pretrial "Exceptions To The Indictments," which we will construe as motions to quash. In their motions, appellants alleged that the indictments did not specify the type of "possession" necessary to provide appellants with sufficient notice of the charges against them.

The indictment states, in relevant part, that appellants:

... did unlawfully, intentionally and knowingly possess a usable quantity of marihuana of less than two thousand pounds but at least two hundred pounds.

The Controlled Substances Act, under which appellants were charged, defines possession as actual care, custody, control or management. TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(23) (Vernon 1979) (now codified at TEX.HEALTH & SAFETY CODE ANN. § 481.002(38) (Vernon 1992) (effective September 1, 1989)). *See* TEX.PENAL CODE ANN. § 1.07(a)(28) (Vernon 1974). The Texas Court of Criminal Appeals has held that an indictment does not have to specifically define the term "possession" since the term is defined by statute. *Phelps v. State,* 623 S.W.2d 936, 937 (Tex.Crim.App.1981). In *Phelps,* it was noted that "possession" was "not an act, nor is it an omission, but is defined as something distinct from both act and omission." Since the term does not go to an act or omission of the defendant, no more precise definition is required. *Knab v. State,* 626 S.W.2d 60, 61 (Tex.Crim.App. [Panel Op.] 1982); *Thomas v. State,* 621 S.W.2d 158 (Tex.Crim.App.1981).

We hold that the indictments were sufficient to give appellants notice of the offense charged and that they were not fatally defective for failing to allege which type of "possession" the State intended to prove. Appellants' third point of error is overruled.

■ By their first point of error, appellants contend that the trial court committed error at the punishment stage of the trial by charging the jury on parole in accordance with TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4(a), which the Texas Court of Criminal Appeals held unconstitutional in *Rose v. State,* 752 S.W.2d 529 (Tex.Crim.App.1987) (opinion on rehearing). *See* TEX.CODE CRIM. PROC.ANN. art. 37.07, § 4(a) (Vernon Supp. 1994).

Appellants were indicted for aggravated possession (between 200 and 2,000 pounds) of marihuana.[2] The punishment for this offense is confinement for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000.[3] The trial court instructed the jury pursuant to the jury instruction mandated by TEX.CODE CRIM. PROC.ANN. art. 37.07, § 4(a).[4] The jury charges were identical in both cases, with the exception of appellants' names, and read in pertinent part as follows:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the sentence imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole. Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, [s]he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-third of the sentence imposed. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if [s]he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

We note that the first paragraph contains an erroneous statement concerning good conduct time. *See Rose,* 752 S.W.2d at 534 n. 6.

---

**2.** TEX.HEALTH & SAFETY CODE ANN. § 481.121(c) (Vernon 1992).

**3.** TEX.HEALTH & SAFETY CODE ANN. § 481.121(d)(2) (Vernon 1992).

**4.** Act of May 26, 1985, 69th Leg., R.S., ch. 576, § 1, 1985 Tex.Gen.Laws 2195, reenacted by Act of May 17, 1989, 71st Leg., R.S. ch. 103, § 1, 1989 Tex.Gen.Laws 442, to be effective upon approval of a constitutional amendment by the voters, which occurred on November 7, 1989.

Appellants did not object to the charge or instructions. However, it was not necessary for appellants to object to the erroneous submission to preserve "*Rose* error." *Id.* at 552–553.

The Court of Criminal Appeals has instructed us to apply the following general harmless error test to cases where a § 4 instruction has been given to the jury:

"(A) reviewing court must examine the record for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment, the ultimate inquiry being whether it is impossible to say beyond a reasonable doubt that considering declarations made by the trial court in its § 4 instruction law did not influence the jury adversely to appellant in assessing punishment."

*Arnold et al. v. State,* 786 S.W.2d 295, 300, 321 (Tex.Crim.App.1990).[5] Tex.R.App.P. 81(b)(2) provides as follows:

(2) *Criminal Cases.* If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

We review the entire record and apply this standard.

Appellants do not allege charging error under Tex.Code Crim.Proc.Ann. art. 36.19. A review under *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1985) is therefore inappropriate in this case. *Rose,* 752 S.W.2d at 537 n. 9 and 553 n. 3 (opinion on rehearing) (concurring Justices would apply *Almanza's* two-tiered harm analysis). *But see Jones v. State,* 850 S.W.2d 236, 240 (Tex. App.—Fort Worth 1993, no pet.) (applied *Almanza,* found no egregious error); *Barreda v. State,* 760 S.W.2d 1, 3 (Tex.App.— Corpus Christi 1987), *pet. dism'd, improvidently granted,* 760 S.W.2d 1 (Tex.Crim.App. 1988) (applied *Almanza* harm analysis);

*Rodriguez v. State,* 745 S.W.2d 572, 575 (Tex. App.—Corpus Christi 1988, pet. ref'd) (applied *Almanza* harm analysis), *appeal after remand on other grounds,* 779 S.W.2d 884 (Tex.App.—Corpus Christi 1989), *aff'd,* 808 S.W.2d 496 (Tex.Crim.App.1991).

We must, therefore, determine whether the error did not contribute to the punishment beyond a reasonable doubt and look to factors which may indicate that the error was harmless. *Arnold,* 786 S.W.2d at 300. In the instant case, we consider the following factors: 1) whether parole was discussed during the *voir dire* examination, 2) whether the charge contained a curative instruction, 3) rejection of probation despite eligibility, 4) the nature of the offense, 5) whether counsel objected to the charge on parole, 6) whether counsel argued about parole, 7) whether the jury wrote notes about parole, 8) the term of years assessed, 9) any deadly weapon findings, 10) the "heinousness" of the crime, and 11) appellants' prior criminal records. *See id.* at 301–312.

We will discuss these factors in the order presented by appellants on appeal.

### I.

■ During general *voir dire* examination, the State introduced its prospective witnesses, informed the jury on the range of punishment applicable to the case, and inquired whether the venirepersons could consider the full range of punishment. After acknowledging several raised hands, the prosecutor was interrupted by the trial court:

Court: Mr. Moore, you might like to advise them about the matter of parole and the law on parole. In addition, you may want to do so at this time. We shall do so in the charge.

Prosecutor: Obviously, this will be in a Court instruction on the issue of parole in connection with some new legislation requirements, but the question I have at this point in time is this, and again, I don't know, I'm not here to criticize, I'm

---

5. In *Arnold v. State,* the Court of Criminal Appeals held that *Rule 81(b)(2)* mandates a presumption of harm, thereby revoking the appellate "rebuttable presumption" analysis applied in *Rose v. State,* 752 S.W.2d at 554. *Arnold,* 786

S.W.2d at 311. *See Harding v. State,* 790 S.W.2d 638, 640 (Tex.Crim.App.1990), *on subs. appeal,* 822 S.W.2d 817 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd).

here to enforce the law, and all I want to know is: How many of y'all could consider life in a particular situation? You don't know the facts, but at least consider life? Anybody else feel like they could not do it? Anybody else feel like they could not consider life on a case depending on the facts?

The State did not address the parole issue again during the *voir dire* examination.

We find that the court's reference to the parole instruction during *voir dire* examination was not all that significant. *Cf. Johnson v. State,* 768 S.W.2d 788, 789 (Tex.App.—Dallas 1989, pet. ref'd) (extensive voir dire regarding parole laws). We see no harm to appellants where there is nothing more than a slight reference to the parole laws and no further discussion of the issue during the proceedings. *See Arnold,* 786 S.W.2d at 301 n. 5. Accordingly, we find that *voir dire* did not implicate consideration of parole.

### II.

The record reveals that the charge did not contain the traditional *Rose* "curative instruction." *See Arnold,* 786 S.W.2d at 311. While a "curative instruction" is a probative factor in a harm analysis for *"Rose* error," "no part of a § 4 instruction can be reasonably characterized and fairly regarded as 'curative.'" *Arnold,* 786 S.W.2d at 311 n. 23 and accompanying text 786 S.W.2d at 310–311, 317 (approving concurring opinion in *Olivarez v. State,* 756 S.W.2d 113, 115 (Tex.App.—San Antonio 1988, no pet.)); *Harding v. State,* 790 S.W.2d 638, 640 (Tex.Crim.App.1990), *on subs. appeal,* 822 S.W.2d 817 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). Where the only mention of parole is in the § 4(a) instruction and there is no other indicia of factors reasonably inducing rational jurors to consider parole, that the trial court gave no "curative instruction" is impertinent. *Gaines v. State,* 786 S.W.2d 295, 318 (Tex.Crim.App. 1990) (consolidated opinion reviewed with *Arnold et al. v. State*) (court also considered no prior criminal record as factor).

The State contends that other factors combine to outweigh any charge error and indicate, beyond a reasonable doubt, that the jury did not consider parole in assessing

punishment, but it fails to specify what these factors are. The State has the burden of showing that constitutional error is harmless beyond a reasonable doubt. *Arnold,* 786 S.W.2d at 311, 321. *See Satterwhite v. Texas,* 486 U.S. 249, 259, 108 S.Ct. 1792, 1798–99, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967). Here, the State has failed to meet that burden with regard to "curative instruction."

Nevertheless, we must examine the entire record for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment.

### III.

Appellants contend that the jury's rejection of their application for probation, which was properly proved up and submitted to the jury in the court's charge, is a significant factor indicating harm. Appellants point out that they had no prior criminal records, expressed remorse in committing the offense, and had a history of gainful employment. The record also reveals that appellants supported seven children and maintained good reputations for being peaceful and law-abiding citizens. During final argument, the State argued that probation was not a suitable resolution for the offense involved. Appellants' trial counsel asked the jury to consider, as mitigating factors, appellants' lack of knowledge of the quantity of marihuana they were paid to transport and their need for probation for the sake of their young children who would be left without parents if jail time were assessed. At no time was parole discussed during argument.

These facts alone may not indicate that the jury was operating under influence of the § 4(a) instruction. In a given case, however, a correlation between probation and a § 4 instruction may in fact appear. *Arnold,* 786 S.W.2d at 308, 324 n. 37. *See Peake v. State,* 822 S.W.2d 166, 169 (Tex.App.—Houston [1st Dist.] 1991, no pet.); *Barreda v. State,* 760 S.W.2d at 3 (fact that jury assessed punishment at 9 years yet rejected probation raises possibility of harm). *See Hernandez v. State,* 771 S.W.2d 596, 597 (Tex.App.—Cor-

pus Christi 1989, no pet.) (appellant's eligibility for probation considered a factor in determining harm). In the instant case we consider it relevant that appellants made an application for probation, properly proved it up and submitted it to the jury.

## IV.

Appellants contend that the offense and the circumstances of its commission do not demand severe punishment. Appellants argue that no weapons were involved and that they were not involved in organizing the scheme to smuggle the marihuana into the country and transport it to Houston. Appellants and the State agree that the most damaging evidence against appellants was the fact that their children were in the motor home at the time of the offense. The State contends that both the egregious nature of the crime and the surrounding circumstances comport with the sentences assessed. Appellants had in their possession in excess of 1,000 pounds of marihuana and involved their children in the drug trafficking scheme.

The facts of an offense cannot rule out that the jury may have taken into account a § 4(a) instruction in determining punishment. *See Arnold,* 786 S.W.2d at 312 (citing *Satterwhite,* 486 U.S. at 258, 108 S.Ct. at 1798 and *Olivarez,* 756 S.W.2d at 115) (sufficiency of evidence is a matter of little consequence in a harmless error analysis). The seriousness of the offense should never justify the verdict and does not clearly demonstrate that the § 4(a) instruction was harmless beyond a reasonable doubt. *See Rodriguez v. State,* 745 S.W.2d at 576.

## V.

Appellants contend that the number of years assessed is evidence that the § 4(a) instruction affected the minds of the jurors during their deliberation. During final argument, the State suggested to the jury that punishment for the female defendants should be in the lower range of punishment since they were not as involved as Juan Manuel. The State recommended that punishment for Juan Manuel should be no less than 15 years plus one day. The record reflects that no argument was made to the jury about parole.

*Cf. DeLeon v. State,* 771 S.W.2d 569, 572 (Tex.App.—Corpus Christi 1989, no pet.); *Mathews v. State,* 767 S.W.2d 858, 860 (Tex. App.—Corpus Christi 1989, no pet.); *Guerra v. State,* 760 S.W.2d 681, 697 (Tex.App.— Corpus Christi 1988, pet. ref'd). The jury ultimately assessed punishment for Juan Manuel at 25 years and one day (10 years greater than the prosecutor's suggested punishment) and 15 years and one day for Leticia.

The disparate punishments against the two defendants for their involvement in the offense may indicate that the jury determined that the degree of their respective culpability was unequal. Appellants contend that only the seriousness of the offense, vigorously argued by the State, and the presence of appellants' children in the vehicle could have provoked the jury to deny probation and assess the terms of years as they did. We, however, can only speculate what induced the jurors to produce disparate sentences and why the jury settled for confinement in the penitentiary instead of probation. Our undertaking is to assay extant factors and circumstances germane to punishment for a likelihood that the instruction affected deliberations and thereby influenced jurors in assessing the terms of punishment for each appellant as reflected in their verdict.

After reviewing the evidence and the number of years assessed against each appellant, we cannot determine beyond a reasonable doubt that the § 4(a) instruction made no contribution to the punishment. Given the punishments assessed (in excess of the State's suggestion) and the disparate terms of confinement, the circumstances of the crime, the eligibility of probation, no curative instructions, and no prior convictions, we are unable to conclude beyond a reasonable doubt that error was harmless. *See Hernandez v. State,* 771 S.W.2d at 597 (considering appellant's eligibility for probation, the potential range of punishment, the nature and facts of crime, and uncontroverted testimony of appellant's character as peaceful and productive citizen, error was not harmless beyond reasonable doubt); *Rodriguez v. State,* 762 S.W.2d 727, 732–733 (Tex.App.—San Antonio 1988), *pet. dism'd, improvidently*

*granted,* 815 S.W.2d 666 (Tex.Crim.App.1991) (where accused is first time offender and no curative instruction given, error was not harmless beyond reasonable doubt); *Barreda v. State,* 760 S.W.2d at 3–4 (defendant had no prior convictions, eligible for probation, and punishment was roughly in middle range authorized by law for offense, error was not harmless); *Salas v. State,* 756 S.W.2d 832, 834 (Tex.App.—Corpus Christi 1988, no pet.) (where defendant was only sixteen, still in school, and no priors, held not harmless error); *Olivarez v. State,* 756 S.W.2d at 115 (although incorrectly applying "rebuttable presumption" standard, held that assessment of punishment at twenty years more than minimum set by law, together with no curative instruction, indicated possibility of harm); *Rodriguez v. State,* 745 S.W.2d at 576 (where accused was sentenced ten years greater than minimum allowed, cause remanded for new trial on punishment only). Appellants' first point of error is sustained.

■■■ Appellants contend that, although art. 44.29(b) allows us to remand a case for punishment only, the law at the time of trial required a complete new trial on guilt as well as punishment. *See* TEX.CODE CRIM.PROC. ANN. art. 44.29 (Vernon 1981). Since the trial court's judgments were rendered after the effective date of TEX.CODE CRIM.PROC. ANN. art. 44.29(b) (Vernon Supp.1993) (effective date August 31, 1987), we need only remand for punishment. Appellants' contention that we must afford a complete new trial is inconsistent with the ruling of the Texas Court of Criminal Appeals in *Grimes v. State,* 807 S.W.2d 582, 588 (Tex.Crim.App. 1991). *See Rodriguez v. State,* 779 S.W.2d 884, 886 (Tex.App.—Corpus Christi 1989), *aff'd,* 808 S.W.2d 496, 497 (Tex.Crim.App. 1991).

We AFFIRM the judgments of the trial court on guilt, REVERSE the judgments of the trial court on punishment, and REMAND both cases to the trial court for new trial on punishment only.